## VARNADO v. REX PETROLEUM CORPORATION, Inc., et al.

### No. 1123.

Court of Appeal of Louisiana. First Circuit. April 17, 1933.

McCoy, Moss & King and W. C. Braden, all of Lake Charles, for appellants.

Hawkins & Pickrel, of Lake Charles, and John B. Fournet, of Jennings, for appellee.

LE BLANC, Judge.

The only issue in this case is one of fact as to whether the motorcycle on which the plaintiff, Cody Varnado, was riding was struck by an automobile belonging to the Rex Petroleum Corporation, Incorporated, and being driven by one Sloan Emerson its president and general manager at the time. Incidentally, too, the amount of damages allowed by the judgment of the lower court in favor of the plaintiff presents a serious question.

The plaintiff was a patrolman in the service of the Louisiana highway commission, using his own motorcycle as a means of conveyance. On July 8, 1931, he was patrolling highway 90, known as the Old Spanish Trail between Lake Charles and Vinton. He was traveling west toward Vinton and, on approaching the place where a road to Edgerly leads off from the highway, just east of a garage known as Read's Garage, he claims that he was run into by this automobile being driven by Sloan Emerson and seriously injured.

It is not disputed that Sloan Emerson was on the highway in the neighborhood of the accident at the time driving west in a large cream colored Buick coupé which belonged to the Rex Petroleum Corporation, Incorporated. As he left Lake Charles, he picked up two boys on the Calcasieu river bridge. One of these boys named Carruthers knew Emerson and asked him for a ride. It is shown unquestionably by the testimony of these two boys that Emerson had been drinking. In fact, he admits that he had and from other evidence in the record, it would appear that he was very much intoxicated.

Between Lake Charles and Sulphur, Emerson passed plaintiff on the highway. As he approached him, he evidently was driving at a rapid rate of speed and in a carefree manner as the boys had to caution him to slacken his speed because of the presence of the road cop ahead. To their warning, Emerson answered that if the cop did not get out of his way he would run over him. The Carruthers boy when asked if Emerson drove close to any other objects on the road answered: "Oh, he shaved some of them pretty close. * * * Others he would go around them all right." Emerson himself admits that he passed plaintiff this first time and that the boys did mention something to him about coming close to him and he answered in a joking way that they would knock him off the road. Counsel for defendants had one of these boys admit that from Emerson's tone of voice he was not serious in his remark about running over plaintiff and we would hate to think that he was. All of the testimony on this point, however, furnished strong proof of the fact that in his hands, in the condition in which he was at the time, this large Buick automobile was a dangerous instrumentality being operated in a dangerous and reckless manner on the public highway. It was so unsafe that we get the impression from their testimony that the two boys were glad when they reached Sulphur and Emerson stopped, so that they could get out.

Emerson says that he does not remember passing plaintiff a second time, that is between Sulphur and Vinton after he had stopped at Sulphur, and still there can be but little doubt from all other testimony and the circumstances related in the record that it is a fact that he did. In justice to him we must say that he does not deny that he did, satisfying himself by merely stating that he believes that he would have remembered if he had hit him as plaintiff claims he did. Asked the direct question: "Are you in a position now to say that you did not strike the motorcycle with your automobile?" He answers: "No, sir, not that I know." Pressed further, he is asked: "Well, are you sure that you did not do it or will you say that you simply don't know whether you did or not?" and he answers: "I wouldn't say * * * I say it was possible." This testimony impresses us as that of a man who wants to be truthful and who whilst he does not want to admit certain facts about which he is being interrogated, cannot conscientiously deny them. Testimony of this character is not sufficient, in our opinion, to rebut positive statements such as are made by the plaintiff herein to the effect that he was struck from the rear of his motorcycle by an automobile the license plate number of which he was able to read as it passed on ahead of him which he immediately wrote in a small note book used by him in

carrying on his work, and which number identified the car as that being driven at the very moment by Emerson.

In describing the accident, plaintiff says that when he fell, his left foot was jammed under the motorcycle and it was after he got up that he jotted the license number which he had "caught as the car shot by" in his little book. It is strenuously contended by counsel for defendants that such a feat, while possible, is hardly probable. It is seriously doubted, they urge, that there is one chance out of a hundred of it being accomplished under the circumstances confronting the plaintiff at the moment. In this case, we must bear in mind that the person claiming to have performed it was a traffic officer charged with the very duty of observing automobile license plate numbers and taking them down hurriedly. It would seem that the nature of their employment would require that they be trained for quick observation and perception along those very lines. Therefore, it may be that the very probability or chance which counsel admits, existed in this very case. As for the circumstances under which it was done, we believe that the fact that the officer in this case being personally involved in the accident, and being, as the evidence discloses, in complete control of his mental faculties, was the more apt to have quickly thought of and caught the license number of the car that had struck his motorcycle.

After plaintiff got up, he walked over to Read's garage near by and first asked for a fast running car with which he could catch up with the one that had hit him. There was no car available there so he waited a few minutes until a strange car bearing an Ohio license number came along. He hailed this car, explained his trouble to the people in it and they picked him up. It happened that they had also picked up the same Bertrand boy who had been riding with Emerson and he told plaintiff about their experience when they had first passed him on the highway, from all of which plaintiff and the boy as well seem to have concluded that it was Emerson who had run into plaintiff's motorcycle. When they arrived at Vinton, plaintiff says that he went to a garage where he could telephone the license number he had caught on the car to his superior officer, Sergeant Fanguy at Lake Charles, to have the latter check up on it. Counsel for defendants contend that it was after the Bertrand boy had told him about Emerson and after he had seen Emerson's car in Vinton that plaintiff telephoned the information about the license number to Fanguy. The testimony, however, as we interpret it, shows that it was not until after he had 'phoned, that plaintiff saw the car and verified the number he had caught as it went by him after the accident.

In connection with the testimony relative to this telephone conversation, it is to be noted also that Fanguy, at whose home plaintiff and his wife lived, was not in and that it was Mrs. Varnado who spoke to him. In relating the conversation, she testifies that her husband told her that "someone had hit him" and for her to get in touch with Fanguy so that he could look up the license number he gave her and come to meet him at Vinton where he would be waiting. If, as counsel for defendants contend, plaintiff had already ascertained from seeing Emerson's car in Vinton that it bore that license number, would not it have been the natural thing for him to have told his wife that it was Emerson and not "someone" who had hit him? Would not he rather have said that he knew it was Emerson's car that had struck him because he had seen the license number on it in Vinton, and have Fanguy verify it? All of this leads us to believe that when he 'phoned to Lake Charles, he had not yet seen Emerson's car in Vinton, and that he was giving the number as he had noted it in the book he carried for that very purpose.

Defendants produced three witnesses, Read, the garage man, Fabacher, his mechanic, and Silcot who was having his truck repaired, who all testified that when plaintiff walked up to the garage he told them that he had been struck by a large car which bore a Texas license number, of which he had been able to catch only the first figures, "2—2." Hopkins, plaintiff's witness, says that he was standing in the east door of the Read garage, saw the accident, and that when plaintiff walked up to them he said that it was a Buick coupé, bearing a Louisiana license that had struck him. This is what plaintiff says he told them, too. Read, Fabacher, and Silcot all swear that Hopkins was not at the garage at the time. If their statements as to what plaintiff told them about the license is correct, of course, the balance of his testimony about catching the number as the car passed him and telephoning it to Lake Charles becomes very doubtful, and if they tell the truth about Hopkins, his testimony is altogether unreliable. There is other evidence concerning Hopkins which casts a serious doubt as to all that he testified to, but we find on examining the record that Read, Fabacher, and Silcot are also contradicted on some of the things that they were so positive about. Besides, it appears that Read, the principal of these three witnesses, had had on some previous occasion some misunderstanding with the plaintiff and it may be well to take this into consideration in weighing his testimony. At any rate, we do not believe that any of this testimony is strong enough to outweigh the very positive statements of the plaintiff, the rather passive testimony of Emerson, and all the circumstances which point so strongly to the fact that it was the Buick automobile which Emerson was driving that ran into the plaintiff's motorcycle, causing it to turn over. His negligence was the proximate cause of the accident and the

injury which resulted to plaintiff, for which he and his employer in whose business he was engaged at the time must be held liable.

■As a result of the impact of the car with his motorcycle, plaintiff says that the latter was knocked sideways and forward for a distance of about fifty or fifty-five feet. When it came to a stop, the front wheel was just on the right-hand side of the concrete. He was thrown sideways to the pavement, the lower part of his back against the concrete. From this fall he suffered fracture of the sacrum, a probable fracture of the fourth or fifth lumbar vertebræ, and also a fracture involving the coccyx. The most serious injury no doubt was the fracture of the coccyx and it is the one which most probably will tend to cause him partial if not total permanent disability. All other fractures and injuries seem to have healed without displacement. It does not appear certain that the fracture of the coccyx has healed and it is the least bit out of alignment. As we understand it, the coccyx is the extreme end of the spine and when it is injured, causes sensitiveness and pain upon sitting down and placing the weight of the body on it. For that reason persons with an injured coccyx are unable to sit normally without pain or at least much discomfort. In this case, as we have already observed, plaintiff's duties required that he ride a motorcycle and this, all of the doctors who testified agree, he cannot and will not be able to do. Some doubt seriously that he could ride in an automobile without some discomfort. Nor do they think he could occupy any position which requires him to sit for any length of time. A surgical operation might afford him relief but not of such nature as in the opinion of most, if not all the doctors, would be total.

Plaintiff testifies that he suffered severe and almost continual pain and was confined to his bed for several weeks following the accident. At the time of the trial of his case he still complained of pain in the region of his injury, severe headaches, numbness in his right arm, insomnia, and a drawing sensation in the back of the neck. The symptoms of such pain and suffering are, however, more or less subjective and some of the doctors are inclined to believe that he exaggerates them quite a bit.

As a highway patrolman he was earning $170 per month, and because of his age (being twenty-six years old at the time of his accident) and of his alleged permanent disability to earn such salary, he claims very large damages. The district judge we think was rather liberal in his allowance of $9,000 for damages for pain and suffering, physical injuries, and loss of prospective income. He also allowed him $447.09 for doctors' and medical expenses.

As we read the medical testimony, plaintiff's case is not one of absolute total disability. Whilst we agree with the learned trial judge that he is and perhaps will be hereafter incapacitated from holding a job which would necessitate his riding a motorcycle, we are not convinced that he could not attend to similar duties driving an automobile. Besides, it appears from the testimony of some of the doctors that there are many other gainful occupations in which plaintiff might engage. True, they might not be as remunerative as the one he had at the time of his injury, still in the light of present business conditions, it is a matter of more or less common knowledge that the more highly paid employees have all been made to feel the results of those conditions by a reduction of their salaries. Taking all these facts into consideration, we have concluded to amend the judgment of the district court by reducing the amount awarded for physical injuries, pain and suffering, and loss of earning power, from the sum of $9,000 to the sum of $6,000 and as thus amended to affirm it.

■Under the terms and provisions of a policy of liability insurance on the automobile involved in this accident, the Rex Petroleum Corporation, Incorporated, was protected against loss and damage to an amount more than sufficient to cover the judgment herein rendered by the Ætna Casualty & Surety Company, herein made party defendant, and the lower court correctly decreed judgment in favor of the defendants Sloan Emerson and Rex Petroleum Corporation, Incorporated, against the insurer company.

■The judgment of the lower court also correctly disposes of the claim of the Louisiana highway commission, presented by intervention in the suit, for salaries paid by it to the plaintiff for several months after his injury. The amount of the judgment is not based on the salary paid but on whatever amount was payable under the provisions of the Workmen's Compensation Law (Act No. 20 of 1914, as amended).

It is, for the reasons herein stated, now ordered, adjudged, and decreed that the judgment appealed from be and the same is hereby amended by reducing the amount allowed in favor of the plaintiff against the defendants from the sum of $9,447.09 to the sum of $6,-447.09, and that in all other respects it be affirmed.