185 So.2d 563 (1966)
Thomas S. CHASE
v.
Edward DUNBAR et al.
No. 6621.
Court of Appeal of Louisiana, First Circuit.
April 4, 1966.
Rehearing Denied May 9, 1966.
*565 James E. Moore, of Franklin & Keogh, Baton Rouge, for appellant.
Cyrus J. Greco, Herbert M. Williams, Baton Rouge, for intervenor.
Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for Manhattan Fire & Marine Ins. Co., appellant-appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
*566 LANDRY, Judge.
Plaintiff, Thomas S. Chase, instituted this action in tort claiming damages for personal injuries and incidental expense sustained and incurred when, as a bystander, he was struck by a can of flaming gasoline tossed aside by an unidentified party attempting to start a stalled automobile by pouring gasoline from a can into the vehicle's carburetor. Named defendants herein are Edward Dunbar, owner of the inoperative car, his liability insurer, Home Indemnity Company (sometimes hereinafter referred to simply as "Home"), and C. Alvin Tyler, who sold Dunbar the automobile in question.
A petition of intervention was filed on behalf of The Manhattan Fire & Marine Insurance Company, workmen's compensation insurer of plaintiff's employer, Victoria Baptist Church, praying for recovery of the sum of compensation benefits paid plaintiff during an approximate six weeks period of disability. After trial on the merits, the lower court rejected plaintiff's claims against defendant, Tyler, but rendered judgment in plaintiff's favor against Dunbar and his insurer in the aggregate of $2,441.00 and recognized intervenor's claim in the amount of $321.00. Defendant Dunbar and his insurer, Home, have appealed the adverse judgment. Plaintiff has appealed the dismissal of his claims against Tyler and also requests an increase in damages for personal injuries. Intervenor has likewise appealed to protect its claims in the event judgment should be reversed as to the respective defendants.
The salient facts are that on the day of the accident, August 10, 1963, Dunbar, an aged itinerant preacher and piano teacher, went to a business establishment on Greenwell Springs Road, Baton Rouge, near Airline Highway and on attempting to leave was unable to start his vehicle, a 1953 Model Ford. An unidentified motorist in a truck pushed the Dunbar vehicle in a vain effort to get it started. The truck continued to push the Ford along Greenwell Springs Road in a futile attempt to start its motor. Eventually Dunbar's car was parked off the road in front of the premises of the Victoria Baptist Church where plaintiff was employed as janitor and handyman. After parking his vehicle Dunbar walked across the street to a gas station where he telephoned his attorney, defendant Tyler, whom he requested to send assistance. Dunbar then purchased a small quantity of gasoline which he carried in a can kept in his automobile. He returned to his car and commenced pouring gasoline from the can into the vehicle's carburetor in an effort to start the engine. While Dunbar was so engaged, plaintiff, noting the vehicle parked in front of the church property, offered his assistance and ventured the opinion the fuel pump was not in working order. Thereafter, two white men, whom Dunbar believed to be mechanics sent by Tyler, arrived on the scene and assumed the task of starting the vehicle. One of the "mechanics" poured gasoline from the can into the car's carburetor while the other operated the starter. In the process, the gasoline in the can ignited and the "mechanic" holding the container cast it aside admittedly without looking in the direction in which the object was thrown. Plaintiff, who was then standing some distance from the car in the act of picking up paper from the church grounds, was struck on the chest by the fiery missile which ignited plaintiff's clothing causing the injuries hereinafter described.
Plaintiff's claims are predicated on the grounds the persons attempting to start Dunbar's automobile were Tyler's agents acting within the scope and course of their employment thus rendering said defendant liable for their tortious actions under the doctrine of respondeat superior. As regards Dunbar and his insurer, plaintiff maintains the "mechanics" were Dunbar's agents also and alternatively that they were omnibus insureds under the policy issued by Home inasmuch as they were using the vehicle with the owner's consent.
*567 Dunbar's defense is grounded on the contention he was not participating in the attempt to start his vehicle at the time of the accident as he was then relying upon the two white "mechanics" dispatched to the scene by their employer, Tyler. Home's defense, of course, accords with that of Dunbar and additionally contends its named insured was not involved in attempting to start the automobile consequently the "mechanics" were not omnibus insureds because of certain policy exclusions which will hereinafter be considered in detail.
Defendant Tyler resists plaintiff's claims asserting the individuals he requested to go to Dunbar's aid were not his agents but merely "good Samaritans" whom he asked to render Dunbar a favor. Alternatively he pleads contributory negligence on the part of plaintiff in participating in the dangerous undertaking of pouring gasoline into the carburetor of the automobile under the circumstances shown and voluntarily remaining in a position of potential danger despite knowledge of the dangerous activity being performed by the "mechanics."
Upon finding plaintiff free of contributory negligence and concluding the "mechanics" were not Tyler's agents, but rather those of Dunbar because Dunbar was present and permitted them to proceed as they saw fit, our learned brother below rendered the judgment hereinabove indicated.
That there was negligence on the part of the unidentified "mechanic" who flung aside the flaming can of gasoline without even the remotest thought as to the consequences of such act, is hardly open to argument. Indeed the issue is not seriously argued and we shall preclude further consideration of such point by merely stating that his action in this respect was negligence of the grossest sort.
Nor is there any doubt that our esteemed colleague below correctly resolved the question of plaintiff's contributory negligence. Assuming, as argued by defendant, plaintiff initially assisted Dunbar in pouring gasoline into the carburetor of the stalled automobile, the record clearly establishes that at the time of the accident plaintiff was totally unconcerned with the project of starting the vehicle. It is uncontradicted that when the accident occurred plaintiff was some distance from the vehicle engaged in the act of "policing the church grounds" by picking up paper while waiting for his own automobile to be returned by a party to whom it had been entrusted for repairs. While the record does not establish precisely how far distant plaintiff was from Dunbar's car, neither does it establish that he was in such proximity that it may be said he should have anticipated he might be in a position of danger. Manifestly, he could not be expected to anticipate the eventuality of a can of flaming gasoline being suddenly thrown in his direction without warning. The burden of establishing plaintiff's alleged contributory negligence rested upon defendants who failed to discharge the onus.
We believe, however, our able brother below erred in determining the "mechanics" were not Tyler's agents.
The testimony reflects that Mr. Tyler owns a vacant lot behind his law office whereon he stores automobiles seized for sheriff sale, some of which are in due course adjudicated to him. At one time Mr. Tyler ran an automobile repair shop located on the premises and operated by his nephew. While Mr. Tyler testified he did not operate the shop at the time of the accident, his part-time employee, Frank Profit, testified that to the best of his recollection the repair shop was in operation at the time of the accident in question. That Tyler was in legal effect engaged in the commercial enterprise of selling used automobiles is established by a clear preponderance of evidence. It is undisputed that Tyler habitually kept numerous old vehicles on the lot, repaired them when necessary and sold such automobiles generally on the installment plan. He also employed various "mechanics" on a parttime basis to service and repair vehicles.
*568 It further appears Tyler had sold automobiles of ancient vintage to Dunbar on previous occasions, the 1953 Ford in question being either the third of fourth vehicle purchased by Dunbar on time from Tyler. It is also shown that Tyler sold Dunbar yet another similar vehicle following the accident. In addition it appears that Dunbar was Tyler's client and that Tyler had financed Dunbar's home. It is undisputed that whenever Dunbar experienced difficulty with an automobile purchased from Tyler it was customary that he call and enlist Tyler's assistance. Whenever Tyler could be contracted he invariably sent someone to either repair Dunbar's car or tow it to Tyler's lot for repairs. The testimony of Tyler's part-time employee, Frank Profit, is clearly to the effect that he himself worked on different cars for Tyler and that he, Profit, also purchased a car from his said employer.
Although defendant Tyler admitted he did on occasion send assistance to Dunbar as a favor, he did not recall having done so on the occasion of the incident in question. However, in Articles 13 and 14 of his answer he acknowledges that on the date of the accident he requested two individuals who were waiting in his office to see him if they would kindly go out and assist Dunbar whose automobile was stalled near the Victoria Baptist Church. He declared, however, that said persons went as "good Samaritans" to aid Dunbar, not as his agents, although one of said individuals had in the past performed odd jobs for him.
Following the accident, the "mechanics" towed Dunbar's automobile back to Tyler's car lot. The record does not indicate whether the men sent by Tyler were paid by him for such services, but it is abundantly clear Tyler had an economic interest to serve in sending someone to Dunbar's aid. Dunbar was Tyler's client and repeated customer in the purchase of automobiles. Even though Tyler may not have been under a duty to furnish such service to Dunbar nevertheless it was to his financial advantage to accommodate a customer and client with whom he had repeated dealings. We have no hesitancy in concluding the individuals dispatched to Dunbar's aid were in legal contemplation agents of Tyler. It is settled law that a principal is responsible for the acts of his agents committed within the scope of the agency. Oglesby v. Town of Winnfield, La.App., 27 So.2d 137. Consequently, the judgment of the trial court rejecting plaintiff's demands against defendant Tyler must be reversed.
Adverting to the alleged liability of Dunbar, we are cognizant of the rule that the negligence of a driver is imputable to the owner of an automobile who is present in the vehicle and possesses theoretical right of control over the driver's actions. Service Fire Insurance Company v. Johnson, La.App., 138 So.2d 410; Mayberry v. McDuffie, La.App., 135 So.2d 366. However, in cases involving maintenance and repairs to a vehicle, when the owner relies entirely upon the serviceman or repairman to perform the needed work and does not undertake supervision of direction thereof, the owner is deemed to have surrendered control to the servicemen upon whose skill he relies.
The record in the instant case is devoid of evidence regarding the true identity of the individuals Tyler sent to the scene. Nor is it shown whether or not they were qualified auto mechanics. Dunbar's testimony is to the effect he assumed the individuals were competent mechanics who knew their trade. He further stated that as usual he was relying upon the skill of the persons sent to his aid by lawyer Tyler. According to the testimony, Dunbar was merely standing idly by and did not undertake in any manner to direct, supervise or control the actions of the "mechanics" sent to start his automobile. Under the circumstances we can conclude only that Dunbar had relinquished control of his vehicle to persons whom he had reason to *569 believe possessed superior knowledge of the vehicle's engine and such skill and experience as rendered them better qualified to effect the needed repairs. Accordingly, we find no legal basis for imputing the negligence of the repairman to defendant Dunbar and the judgment of the lower court against said defendant individually must be set aside.
We consider now the alleged liability of Dunbar's insurer, Home. Plaintiff maintains that according to the policy terms the unidentified "mechanic" was an insured. The policy, which appears of record, undertakes to "pay on behalf of the insured" damages which "the insured shall become legally obligated to pay as a result of bodily injury and property damage (up to specified limits) arising out of ownership, maintenance or use of the owned automobile. * * *" (Emphasis added.)
Pursuant to an amendatory endorsement affixed to the policy the term "insured" is defined as follows:
"The following are insureds under Part I:
(a) with respect to the owned automobile,
(1) the named insured * * *.
(2) any other person using such automobile with the permission of any named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission. * * *" (Emphasis added.)
Defendant insurer contends the words "ownership," "maintenance" and "use" are three distinct and mutually exclusive terms; that only the named insured and residents of his household are covered against liability arising from ownership or maintenance; and that the liability of other persons is insured against only if it arises out of the "use" of the owned automobile. Home also maintains the accident arose as a result of maintenance rather than use consequently the "mechanic" was not using the vehicle and therefore was not an insured. Finally, the insurer argues that if the "mechanic" were in fact using the vehicle coverage does not attach because of an exclusionary clause providing that the policy does not apply to the insured vehicle "while used by any person while such person is employed or otherwise engaged in the automobile business."
According to the hereinabove cited policy provisions, the term "insured" includes "any other person using such automobile * *" provided "his actual operation or * * * his other actual use thereof" is with the permission of any named insured. The word "using" is a verbal form (specifically a participle) of the term whose noun form is "use." We believe no purpose of consequence would be served in attempting to distinguish the terms "using" and "use" because, for all practical considerations the terms are synonymous and embrace identical activities. The question appears, therefore, whether the activity engaged in at the time of the accident was "use" as distinguished from "maintenance" which terms are not synonymous but distinct and separate in meaning. Wall v. Windmann, La. App., 142 So.2d 537.
Quite obviously the term "use" embraces and includes the designation "operation" but is not restricted thereto inasmuch as the policy recites the user is protected if his actual operation or (if he is not operating) his other actual use, is with permission of any named insured. Consequently, it is abundantly clear that the policy contemplates protecting against use consisting of activities other than actual operation of the insured vehicle. The provision appears to accord with the established jurisprudence which recognizes that the fact that an omnibus insured was not actually operating a vehicle does not necessarily mean he was not using it within the meaning of the term "using" as appears in a liability policy. In this connection we note that in Tucker v. State Farm Mutual Automobile Ins. Co., La. App., 154 So.2d 226, it was held a motor *570 vehicle was not being used when the circumstances revealed a seven-year old child disengaged the gears or released the emergency brake of an automobile parked in an inclined driveway. However, in Bolton v. North River Insurance Company, La.App., 102 So.2d 544, this court held that a passenger occupying the rear seat of a vehicle and negligently slamming the door on plaintiff's hand was "using" the vehicle.
Knight v. Thomas, La.App., 141 So.2d 134, characterizes as "maintenance" the dislodging of a bearing from a vehicle's axle by means of a cold chisel and ballpeen hammer. More nearly analogous to the case at bar is that of Wall v. Windmann, La.App., 142 So.2d 537, wherein it was held the starting of a truck's motor at the request of a mechanic repairing the engine constituted "maintenance." Obviously no hard and fast rule can be laid down pursuant to which the distinction may unerringly be made in every instance between "use" and "maintenance." Equally obvious, we believe, is the proposition that as regards such distinction, each individual case must be adjudged in the light of its own peculiar facts and circumstances. Since starting an automobile for the purposes, inter alia, of using it as a conveyance or source of power or energy would manifestly constitute use as distinguished from maintenance, we conclude that the act of starting or attempting to start a vehicle must be categorized as "use" or "maintenance" according to the circumstances in each case including primarily, but not exclusively, the intent, purpose and objective of the person concerned.
In the present case the evidence overwhelmingly shows the "mechanics" were not attempting to start the car with intent to "use" the vehicle for any purpose but with the sole aim of rendering it operative for use by its owner. The actions of the "mechanics" herein were in essence a test to determine whether the engine could be made to run to whether adjustments or repairs were necessary to make it functional. We hold, therefore, that the attempt to start the vehicle under the circumstances shown constitutes "maintenance" rather than "use" and such activity was not insured against since the policy in question afforded no coverage to an individual engaged in maintaining the insured vehicle. It follows that the judgment against Home is erroneous and must be reversed.
Considering plaintiff's appeal for an increase in quantum, the record reflects that plaintiff was examined and treated by Dr. Alvin Williams within an hour or two following the accident. Dr. Williams testified that plaintiff sustained first degree burns covering plaintiff's face. Plaintiff also received first and second degree burns of the hands, back of the fingers and abdomen. None of plaintiff's burns were sufficiently penetrating to be classified as third degree. Plaintiff was not hospitalized and his injuries healed in approximately six weeks although certain areas, mainly the hands, remained tender and sensitive to irritants such as heat, chemicals, strong soaps and prolonged immersion in water. Plaintiff's facial burns healed without residual disfigurement but some slight depigmentation of the fingers has remained. In urging an increase in the award of $2,000.00 for his personal injuries plaintiff relies upon King v. Mason, La.App., 95 So.2d 705, and Surry v. Arkansas Louisiana Gas Company, La.App., 170 So.2d 133. In the King case, supra, the appellate court increased plaintiff's award from $4,000.00 to $5,000.00. Plaintiff therein was hospitalized 12 days for first, second and third degree burns of the face, neck, ears, both arms and one or two places on his hip. The extent of injuries sustained by the claimant in the King case, supra, were far more serious than those experienced by present plaintiff. In the King case, supra, plaintiff suffered intense pain and was administered morphine, blood transfusions and glucose while hospitalized. Other complications, which are unnecessary to narrate herein, clearly distinguish the severity of the injuries sustained *571 by that plaintiff as compared to those of plaintiff herein.
Our perusal of Surry v. Arkansas Louisiana Gas Company, supra, discloses awards of $15,850 and $10,750, respectively, for two plaintiffs who suffered burns. The opinion in the Surry case, supra, gives scant details of the injuries received. It appears, however, that both claimants were hospitalized for 26 days during which period they were under constant treatment for severe burns. In addition, the court stated the evidence preponderates in favor of the conclusion both claimants would suffer serious, permanent disabling residual effects from their injuries.
The injuries sustained by present plaintiff do not approach in severity or intensity those experienced by claimants in the cited authorities. In the case at bar plaintiff was not hospitalized, there is no evidence to the effect he was given glucose or blood transfusions. Although we may logically assume plaintiff was given some drugs for pain the record herein does not so show. Neither does the record indicate the intensity or duration of the pain suffered by plaintiff as a result of his injuries. Plaintiff herein has no residual effects other than the aforementioned slight depigmentation of his fingers. The trial court's assessment of plaintiff's damages for personal injuries in the sum of $2,000.00 appears neither inadequate nor excessive and we will therefore award a like amount.
Plaintiff alleges a loss of wages but the record shows he continued to receive full salary of $50.00 weekly from his employer without interruption. Despite payment of said wages the employer's compensation carrier paid workmen's compensation benefits in the sum of $35.00 for a period of 7 weeks, an aggregate of $245.00, and medical expense in the sum of $76.00 paid Dr. Williams, for a total of $321.00. It further appears the compensation checks were endorsed by plaintiff to his employer who used the proceeds thereof to employ a substitute to perform plaintiff's duties during plaintiff's disability. Ordinarily a plaintiff receiving wages in lieu of compensation would not be entitled to both wages and compensation because if he is not fully earning wages paid the employer would not be liable for both wages and compensation. In the case at bar the employer was not paying both wages and compensation because the compensation checks were endorsed by plaintiff to his employer who utilized them for the employer's own purpose. While it must be conceded the compensation insurer has become subrogated to the employer's rights against the third party tort-feasor to the extent of compensation benefits paid, nevertheless such subrogation is effective only to such rights as existed in favor of the employer and no more. The employer's right to recover from the third party tort-feasor is limited to the sums paid pursuant to the employer's obligation under the compensation law. Consequently, if payments are mistakenly made by the employer to an employee not entitled thereto, the employer has no claim against the third party for such erroneous payments. Tregre v. Kratzer, La.App., 148 So. 271. Furthermore, if the employer pays full wages in lieu of compensation benefits he may recover from the tort-feasor only such amounts as he was legally obligated to pay. Varnado v. Rex Petroleum Corporation, Inc., La.App., 147 So. 513.
Had plaintiff been paid only the amounts due him as compensation, defendant would be obligated to reimburse the employer (or the employer's insurer) the amount of compensation paid. The tortfeasor does not have to pay the injured employee anything more than the difference between full wages and the amount of compensation due. Otherwise the tort-feasor would be made to pay twice for the same thing. This being necessarily so, when the employer pays the employee full wages in lieu of compensation, the employee has suffered no loss of wages and the liability of the tort-feasor is limited to reimbursement to the employer or insurer of such amounts *572 as the employer or insurer is legally obligated to pay.
In disposing of the analogous issue with respect to sick leave and vacation leave paid by the employer to an incapacitated employee, it has been held that, where such payments would result in a loss to the employee of accumulated sick leave or vacation leave benefits, the third-party tortfeasor is not entitled to credit therefor against a claim for lost earnings. Hudgens v. Mayeaux, La.App., 143 So.2d 606; Chandler v. F. Strauss & Son, La.App., 194 So. 133. It has also been held, however, that where it is not shown that sick leave and vacation benefits are limited with a resulting loss thereto to the extent they are charged against the injured employee, the tort-feasor is entitled to credit. Fenerty v. Culotta, La.App., 80 So.2d 537, amended 228 La. 649, 83 So.2d 888; Le Blanc v. Southern Farm Bureau Casualty Insurance Co., La.App., 104 So.2d 279.
Plaintiff, therefore, suffered no loss of wages and no recovery may be allowed for this item of alleged damages. See Fort v. Northern Insurance Company of New York, La.App., 111 So.2d 874.
We note plaintiff also claimed lost earnings because of his inability to pursue his part time occupation of bicycle repairman. The record, however, contains no evidence upon which an award for this item could be predicated. The testimony adduced by plaintiff in support of this particular claim is too vague, indefinite and uncertain to permit proper assessment of his loss.
Plaintiff's final claim is for certain sums allegedly expended upon resuming his employment when he was compelled to engage others to perform certain duties he was unable to discharge. Although our learned brother below concluded some such expenditures were made by plaintiff, he nevertheless felt the proof thereof was vague and therefore disallowed this particular claim. In this regard one Charles Glasper testified he received from $4.00 to $7.00 weekly from plaintiff for one month following the accident in return for which he performed certain of plaintiff's duties as janitor. Johnnie L. Wade deposed he assisted plaintiff following the accident, the most he received in remuneration being the sum of $5.00 per week. He "guessed" he worked two weeks and later "estimated" he worked "once a week for about three or four weeks." Plaintiff asserted he also occasionally engaged one Donald Jackson and estimated the total paid aggregated ten to twelve dollars per week at least. The foregoing testimony considered, we are of the opinion plaintiff has established such expenditures in the sum of $48.00 and recovery of that amount will be permitted. While it is probable plaintiff extended more than the aforesaid amount, he kept no records and was unable to testify with sufficient certainty and clarity as to justify a larger award for this item.
We also find that plaintiff has established medical expense in the sum of $15.00 in excess of that paid by the insurer. As contended by his counsel, plaintiff is entitled to judgment for said sum.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court rejecting plaintiff's demands against defendant, C. Alvin Tyler, and granting judgment in plaintiff's favor against defendants, Edward Dunbar and Home Indemnity Company, be and the same is hereby reversed, annulled and set aside and judgment rendered herein in favor of plaintiff, Thomas S. Chase, and against defendant, C. Alvin Tyler, in the sum of $2,000.00 for physical pain and suffering, $321.00 for workmen's compensation benefits and medical expense paid by his employer's insurer. Home Indemnity Company, $15.00 for additional medical expense and $48.00 expended by plaintiff for part time assistance, aggregating $2,384.00, together with legal interest thereon from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that there be judgment herein in favor of intervenor, The Manhattan Fire & *573 Marine Insurance Company, and against plaintiff, Thomas S. Chase, and defendant, C. Alvin Tyler, in the full sum of $321.00, together with legal interest thereon from date of judicial demand, until paid, said sum to be paid and payable by preference out of the award above made to plaintiff, Thomas S. Chase, all costs to be paid by defendant, C. Alvin Tyler. The lower court judgment fixing the fee of Dr. Alvin C. Williams, expert witness, is affirmed.
Reversed and rendered.